# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IROC IT ALL CORP., individually and on behalf of all others similarly situated, | Case. No. _____ |
| *Plaintiff.* | |
| v. | **CLASS ACTION COMPLAINT** |
| J.R. SIMPLOT CO.; CAVENDISH FARMS LTD; CAVENDISH FARMS, INC.; MCCAIN FOODS LIMITED; MCCAIN FOODS USA, INC.; LAMB WESTON HOLDINGS, INC.; LAMB WESTON, INC.; LAMB WESTON BSW, LLC; LAMB WESTON/MIDWEST, INC.; and LAMB WESTON SALES, INC., | **JURY TRIAL DEMANDED** |
| *Defendants.* | |

Plaintiff IROC IT ALL CORP., on behalf of itself and all others similarly situated (the "Class" or "Class Members" as defined below) who were indirect purchasers of Frozen Potato Products, brings suit against the Defendants J.R. Simplot Co., Cavendish Farms Ltd, and Cavendish Farms, Inc. ("Cavendish"), McCain Foods Limited and McCain Foods USA, Inc. ("McCain"), and Lamb Weston Holdings, Inc., Lamb Weston, Inc., Lamb Weston BSW, LLC, Lamb Weston/Midwest, Inc. and Lamb Weston Sales, Inc. ("Lamb Weston Defendants") under Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 1, and §§ 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 & 26; under state antitrust and trade regulation statutes; and under common law unjust enrichment for redress of the injury and damages caused by their conspiracy to fix prices of Frozen Potato Products in the United States from at least as early as January 1, 2021, through the date by which the anticompetitive effects of its violations of law shall have

ceased, but in any case no earlier than the present (the "Class Period"). Based upon personal knowledge as to the facts pertaining to themselves and upon information and belief and investigation of counsel as to all other matters, Plaintiff alleges:

## I.    NATURE OF THE ACTION

1.    Plaintiff brings this civil antitrust action seeking an injunction and damages arising out of Defendants' conspiracy to raise, fix, maintain and/or stabilize the prices of frozen French fries, hash browns, tater tots, and other frozen potato products ("Frozen Potato Products") sold in the United States.

2.    Together, Defendants control more than 97% or more of the $68 billion per year Frozen Potato Products market.

3.    By at least the start of 2021, Defendants conspired to fix the prices of their Frozen Potato Products above competitive levels.  To implement their price-fixing conspiracy, Defendants implemented lockstep price increases that allowed them to realize unprecedented profit margins. Although the costs of raw potatoes have declined significantly, the fact that price increases of more than 50% continue to occur suggests that the conspiracy is still ongoing.

4.    When faced with increased input costs in 2021 and again in the spring of 2022, Defendants altered their pricing methods to collectively force price hikes on their products with no worry their customers could defect to competitors. Accordingly, Frozen Potato Product prices climbed 47% between July 2022 and July 2024. However, while Defendants' sales prices steadily increased throughout the Class Period, Defendants' input costs peaked in 2022 and then dropped steadily after that point.

5.     After Defendants implemented a series of matching price increases, one restaurant owner in April 2022 remarked that it was "[a]mazing how all of the major suppliers for French fries and the like are all raising their prices at the same time and by the same amount."

6.     Defendants' conspiracy resulted in unprecedented margins. In 2023, the former VP of International at Lamb Weston acknowledged that Lamb Weston, J.R. Simplot, and McCain "have never ever seen margins this high in the history of the potato industry." He went on to explain that Defendants "absolutely" have "no incentive to fight that hard for each other's share;" instead, they are all "behaving themselves" in order to maintain their record high margins.

7.     Defendants were confident in their ability to sustain these prices because of their agreement. A former Senior Director for McCain Foods admitted in 2024 that McCain was unwilling to compete with Lamb Weston on the price of battered fries. He said that he originally thought McCain should compete and pursue additional market share, but "the higher ups in the room" advised not to do it.

8.     J.R. Simplot's Director of Sales stated that their customers had threatened to switch to one of Simplot's competitors after Simplot increased its prices, "but we knew we weren't worried about it." In short, Defendants had confidence in their commitment to each other; they knew their co-conspirators would not undercut them on price.

9.     Upon information and belief, at least one of the co-conspirators, Lamb Weston, instructed its managers to communicate about competitor pricing and business intelligence using texting instead of emails to avoid creating emails that could be discovered in the event of an antitrust investigation. Although Lamb Weston managers obtained their competitors' price announcements, they were forbidden to email such announcements to C-suite executives so the latter could more plausibly deny receiving information about the announcements.

10.     Defendants were able to successfully implement lockstep price increases and collusively increase prices because the industry is structurally susceptible to collusion. The Frozen Potato Products Market features highly concentrated sellers, high entry barriers, fragmented buyers, repetitive purchases, inelastic demand, and opportunities to collude through common co-packing arrangements, trade association events, and mechanisms to exchange market share and likely other information enabling Defendants to implement and monitor their conspiracy.

11.     But for their conspiracy and unlawful acts in furtherance, Plaintiff and members of the Class would have paid less for Frozen Potato Products than they did during the Class Period.

12.     Plaintiff brings this action for redress of the injury and damages it and members of the Class have suffered and continue to suffer by reason of Defendants' past and continuing violations of law, including for damages, injunctive relief, and disgorgement of Defendants' ill-gotten gains into a common fund from which it and members of the Class may obtain restitution.

## II.     JURISDICTION AND VENUE

13.     This action arises under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Sections 4 & 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 & 26, and the State laws cited herein.

14.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d), and 1337. The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's state law claims.

15.     Venue is proper in this District under 15 U.S.C. §§ 15(a) & 22, and 28 U.S.C. § 1391(b), (c), and (d) because, during the Class Period, Defendants resided, transacted business, were found, and a substantial portion of the alleged activity affected interstate trade and commerce in this District.

4

16.     During the Class Period, Defendants' conduct was within the flow of, was intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States and its territories.

17.     During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate wires, wireless spectrum, and the United States Mail, to effectuate their illegal scheme.

18.     Defendants' conduct also had a substantial effect on the intrastate commerce of each of the United States and the District of Columbia.

19.     This Court has personal jurisdiction over each Defendant because each Defendant transacted business, maintained substantial contacts, and is located and/or committed unlawful conduct in this District. Defendants' unlawful scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

## III.    PARTIES

### A.    Plaintiff

20.     Plaintiff IROC It All Corp. ("IROC" or "Plaintiff") is a corporation organized under the laws of Michigan.  IROC owns and operates IROC It All food truck in and around Oakland County, Michigan.

21.     During the Class Period, IROC indirectly purchased Frozen Potato Products, including frozen French fries, in Michigan from Defendants.

22.     Plaintiff was injured in its business or property as a direct, proximate, and material result of Defendants' violations of law.

23.     Plaintiff is threatened with future injury to its business or property by reason of Defendants' continuing violations of law, absent Court intervention.

**B.     Defendants**

**1.     J.R. Simplot**

24.     Defendant J.R. Simplot Company is a Nevada Corporation with its headquarters in Boise, Idaho.

25.     J.R Simplot is a privately owned company with over 13,000 employees worldwide. J.R. Simplot manufactures Frozen Potatoes at facilities throughout the United States. Simplot is one of the largest potato companies in the world, with gross revenue in 2020 exceeding $6 billion. At all times relevant to this action, Simplot was doing business in the State of Illinois.  J.R. Simplot Company is referred to hereinafter as "J.R. Simplot."

**2.     Cavendish**

26.     Defendant Cavendish Farms, Inc. is a Delaware corporation, that maintains its primary United States office located at 25 Burlington Mall Road, Burlington, Massachusetts, and a manufacturing plant located at 5855 Third Street, S.E. Jamestown, North Dakota. Cavendish Farms, Inc. is a wholly owned subsidiary of Defendant Cavendish Farms, Ltd., a company existing under the laws of the Province of New Brunswick, Canada with its principal place of business located at 100 Midland Dr. Dieppe, New Brunswick, Canada E1A 6X4.

27.     Cavendish manufactures frozen french fries and potato products at facilities throughout the United States and is the fourth largest processor of Frozen Potato products in North America. At all times relevant to this action, Cavendish was doing business in the State of Illinois.

28.     Cavendish Farms Ltd. and Cavendish Farms, Inc., are collectively referred to herein as "Cavendish Farms."

**3.     McCain**

29.     Defendant McCain Foods Limited is a corporation organized under the laws of New Brunswick, Canada, with its corporate headquarters in Toronto, Canada. McCain Foods Limited operates forty-seven sites on six continents.

30.     McCain Foods Limited is a privately owned company, with global revenues in excess of $14 billion Canadian dollars, and is a dominant producer of Frozen Potato Products. It is one of the world's largest manufacturers of French fry and potato products, and it boasts that one in four "fries in the world is a McCain Foods fry."

31.     McCain Foods Limited operates its United States operations through its subsidiary, McCain Foods USA, Inc.  McCain Foods USA, Inc., is a subsidiary of McCain Foods Limited, incorporated in Maine, with its corporate headquarters and principal place of business at One Tower Lane, 11th Floor, Oakbrook Terrace, Illinois, within the Northern District of Illinois. McCain Foods USA, Inc. provides frozen potato and other snack foods "primarily for foodservice customers, retail grocers and private label brands in restaurants and supermarket freezers nationwide" in the United States.

32.     McCain Foods Limited and McCain Foods USA, Inc., are collectively referred to as "McCain."

**4.     Lamb Weston Defendants**

33.     Defendant Lamb Weston Holdings, Inc. is a Delaware corporation with its headquarters in Eagle, Idaho. Lamb Weston Holdings, Inc. is a leading producer, distributor, and marketer of value-added Frozen Potato Products. Lamb Weston Holdings, Inc. stock is traded as "LW" on the New York Stock Exchange. Lamb Weston Holdings, Inc. began as part of Conagra Brands, Inc., which spun off Lamb Weston Holdings, Inc. to Conagra shareholders in 2016.

34. Lamb Weston Holdings, Inc. owns and operates several United States subsidiaries, including Lamb Weston, Inc. (a Delaware corporation), Lamb Weston BSW, LLC (a Delaware LLC), Lamb Weston/Midwest, Inc. (a Washington corporation), and Lamb Weston Sales, Inc. (a Delaware corporation). These subsidiaries are included in the consolidated financial statements of Lamb Weston Holdings, Inc., indicating Lamb Weston Holdings, Inc. wholly owns and controls them and operates them as a unitary enterprise. On information and belief, Lamb Weston Holdings, Inc. conducts its Frozen Potato Products business in the United States through these subsidiaries, including manufacturing, pricing, and selling Frozen Potato Products in the United States. Lamb Weston's publicity for product purchasers and investments refers to "Lamb Weston" or "Lamb Weston Holdings, Inc." Accordingly, hereinafter this complaint refers to Lamb Weston Holdings, Inc., Lamb Weston, Inc., Lamb Weston BSW, LLC, Lamb Weston/Midwest, Inc., and Lamb Weston Sales, Inc. collectively as "Lamb Weston."

35. Lamb Weston sells its Frozen Potato Products in North America to quick-service and full-service restaurants, food service distributors, non-commercial channels, and retailers. Its products include Frozen Potato Products, commercial ingredients, and appetizers sold under the Lamb Weston brand name, as well as under other brands owned or licensed by Lamb Weston, and private label products. Its North American segment sales for fiscal year 2023 was $4.2 billion.

36. Lamb Weston operates twenty-seven production facilities for its products and sources its products pursuant to "co-packing" agreements, "a common industry practice in which manufacturing is outsourced to other companies."

**5. Agents and Co-conspirators**

37. Various other persons, firms and corporations not named as defendants have participated as co-conspirators with Defendants and have performed acts and made statements in

furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of their co-conspirators, whether or not named as defendants in this Complaint.

38.     Whenever reference is made to any act of a corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

39.     Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## IV.     FACTUAL ALLEGATIONS

### A.     Frozen Potato Products

40.     Frozen Potato Products, including French fries, are one of the most popular food items in the United States. The National Potato Council estimated that the entire potato sector contributed $100.9 billion to the economy in 2021, and added $53.5 billion to the United States Gross Domestic Product. Of that $100.9 billion contribution, the National Potato Council estimated $49.1 billion came from processing, wholesaling, and retail efforts. More than two thirds of the potatoes sold in the U.S. in 2018 were used for processing. "Food service is an especially important outlet for potatoes primarily in the form of fries."

41.     For example, Lamb Weston sells its Frozen Potato Products "to quick service and full-service restaurants and chains, foodservice distributors, non-commercial channels, and retailers." It sells to them through "a network of internal sales personnel and independent brokers, agents, and distributors to chain restaurants, wholesale, grocery, mass merchants, club retailers, specialty retailers, and foodservice distributors and institutions, independent restaurants, regional

chain restaurants, and convenience stores." Similarly, McCain provides its products "to retailers, quick service restaurants, supermarket freezers and foodservice outlets worldwide."

42.     About 39% of United States potatoes are frozen and become part of the Frozen Potato Products market.  The United States is the world's fifth largest potato producer.

43.     Frozen Potatoes are produced in a multi-step process that is highly automated using specialized machines. These machines clean and peel potatoes, cut them into strips or other shapes, blanch, dehydrate, par-fry, freeze, pack, and store them.

44.     Frozen Potato producers typically acquire potatoes in mass quantities from potato growers and produce a variety of products in their factories. They sell these products to a variety of customers, including the food service industry, which consists of restaurants, food trucks, hotels, schools, hospitals and other facilities; and, in retail channels, including grocery stores, convenience stores and other retailers such as Target and Wal Mart. Food distributors also purchase Frozen Potatoes from producers.

45.     Frozen French fries provide the largest part of the Frozen Potato Products market. One source found 579,303 restaurants in the United States feature French fries on their menu. "Along with French fries, the Frozen Potato Products market includes hash brown, tater tots, and potatoes that are frozen and shaped in other formats."

46.     The United States produces most of the potatoes it uses for its Frozen Potato Products. For example, for 2023, the United States produced slightly over 17 billion pounds of potatoes for freezing. By comparison, the United States imported 6.39 billion pounds of potatoes for freezing that year.

47.     Imported Frozen Potato Products predominantly come to the United States from Canada. For example, for the 2019 to 2020 market year, the United States, approximately $750

million out of the $810 million market for frozen French fries were imported from Canada, which represents 91 percent of Canada's exports of frozen French fries (measured by Canadian dollars). McCain Foods and Cavendish Farms are responsible for a significant portion of Frozen Potato Products exported to the United States each year.

48.     Frozen Potato Products provide business advantages to restaurants that use them. For a restaurant, making French fries from scratch requires increased horizontal workspace and increased labor to cut up the potatoes.

49.     The foodservice sector is the largest buying segment Frozen Potato Products. This sector includes restaurants, hotels, schools, and hospitals, which often purchase indirectly through distributors.

### B.     Defendants' Parallel Price Increases

50.     Defendants acted in concert to fix, raise, maintain, and stabilize the price of Frozen Potato Products they manufactured, distributed, sold, or imported into the United States. This unlawful conspiracy in restraint of trade began at least as early as January 1, 2021, and continues into the present.

51.     Defendants coordinated price increases at identical or near-identical times during the Class Period to the detriment of Plaintiff and the Class. Defendants sent price increase letters to their customers, noting the amount, outlining an effective date, and sometimes including purported justifications.

52.     Defendants' Frozen Potato Product prices increased in 2021 and then skyrocketed in 2022, and they continued to remain high through at least the end of July 2024, resulting in unparalleled margins for Defendants.

53.     In January 2021, Simplot and McCain each sent price increase letters to their customers within one day of each other. These letters indicated that the cost of Frozen Potatoes

11

would increase by $0.04 per pound. Simplot also notified Plaintiff and the Class that the price of line flow potato products would increase by $0.02 per pound. In January of 2021, Simplot and McCain each sent price increase letters within one day of each other. These letters indicated that the cost of Frozen Potatoes would increase by $0.04 per pound. Simplot also notified Plaintiff and the Classes that the price of line flow potato products would increase by $0.02 per pound. The letters sent by Simplot and McCain both indicated an effective date of March 15, 2021.

54.　　In May 2021, Lamb Weston and McCain sent price increase letters within two weeks of each other. The Lamb Weston letter indicated that the cost of Frozen Potatoes would increase by $0.08 per pound, while the McCain price increase letter indicated that the cost of Frozen Potatoes would increase by $0.04 per pound. The letters sent by Lamb Weston and McCain had effective dates of July 1, 2021 and July 15, 2021, respectively. Furthermore, on June 4, 2021, Cavendish sent price increase letters indicating that the cost of Frozen Potatoes would increase by $0.04 per pound. The Cavendish letter had an effective date of July 15, 2021, the same day as McCain's price increase.

55.　　In October 2021, Lamb Weston, McCain, and Cavendish each sent price increase letters within five days of each other. The price increase letters all indicated that the cost of Frozen Potatoes would increase by $0.08 per pound, and all had the same effective date—December 15, 2021.

56.　　In February of 2022, Defendants Lamb Weston, McCain, Simplot and Cavendish each sent price increase letters within five days of one another, and they all the same effective date: April 1, 2022. The McCain and Cavendish letters indicated that the cost of Frozen Potatoes would increase by $0.12 per pound, while the Lamb Weston price increase letter indicated that the cost of Frozen Potatoes would increase by $0.10 per pound. On April 8, 2022, Cavendish sent a price

increase letter indicating that the cost of Frozen Potatoes would increase by $0.07 per pound, with an effective date of May 15, 2022.

57.     These increased Frozen Potato Product prices cannot be adequately explained by cost inputs. From July 2022 to July 2024, the prices of Frozen Potato Product increased 47%. During that same two-year period, Defendants' input costs peaked around the third quarter of 2022, and declined substantially after that. Defendants' prices remained near their peak from October 2023 through at least July 2024 despite a decline in input costs of about 33%.

58.     The price increases in Frozen Potato Products during 2021-2022 were not coincidental.  Rather, Defendants imposed matching, simultaneous or near-simultaneous price increases on their customers.

59.     In May 2023, as Defendants' input costs were decreasing, two stock analysts predicted that Defendant Lamb Weston's "stepped-up margin expansion" would not "be durable longer term." Contrary to that prediction, Lamb Weston's (and indeed, all Defendants') prices continued to climb and remained uncompetitively high after their input costs had resettled at lower levels.

60.     By raising and maintaining Frozen Potato Products prices, each Defendant in a truly competitive market where they each act in their own economic self-interest, risks a competitor undercutting that Defendant's prices to gain market share That dynamic explains why analysts predicted that Lamb Weston's "stepped- up margin expansion" would not be "durable longer term." Defendants' price increase actions described herein are therefore inconsistent with their individual interests. By colluding, Defendants change their incentives and the incentives of their co-conspirators. Defendants followed their collective interests rather than their individual interests through their collective price increases.

61. The four Defendants—who control at least 97% of the Frozen Potato Products market—have extreme market power and the ability to control price. Therefore, if Defendants collectively raise their prices, that increase moves the market price.

62. Prices for Defendants' Frozen Potato Products increased in near-lockstep during the Class Period. Defendants' price adjustments initially focused on maintaining that company's profit margins, but that all changed.

63. In February 2021, McCain announced a price increase that was soon followed by J.R. Simplot and Cavendish Farms. Lamb Weston did not formally announce a price increase at that time but was understood to increase prices more quietly in that same time period.

64. J.R. Simplot's Sales Director acknowledged that Simplot previously considered pricing increases annually, but then started to increase prices more frequently. In 2021, Defendants began a series of "tit for tat" price increases with each other multiple times per year.

65. In discussing a forthcoming Lamb Weston price increase in September 2021, Lamb Weston's former Vice-President knowingly predicted that competitor McCain would be pleased with the increase and follow suit: "it will probably be exactly the price increase that McCain wanted, which was $0.04 on A grade and $0.02 they will announce a price increase."

66. Early the next year, on February 11, 2022, Lamb Weston announced that it would increase prices to take effect in April, increasing prices on "battered and coated" products by twelve cents per pound and adding ten cents per pound on non-battered products.

67. Just four days later, on February 15, 2022, J.R. Simplot announced the same increase on the same two categories of products, and McCain announced a twelve cent per pound increase on all its frozen potato products.

14

68.     Then, one day later, on February 16, 2022, Cavendish Farms announced a price increase of twelve cents per pound for battered and coated frozen potatoes and "formed items," as well as non-battered frozen potatoes.

69.     On April 19, 2022, the owner of Ivey and Coney, a Washington, D.C. restaurant, posted on X (formerly Twitter) that the Defendants had informed it of uniform price increases, all effective on April 4, 2022.5 The post noted, "Amazing how all of the major suppliers for French Fries and the like are all raising their prices at the same time and by the same amount" and concluded, "Totally not collusion or anything, right?"

70.     Additionally, the Director of Sales at J.R. Simplot acknowledged Defendants' lockstep price increases, noting that in 2022, "that's what we did . . . . like Lamb, they did the $0.10 and $0.12 like we did in April of 2022." He noted that J.R. Simplot took a price increase in May 2022, and Lamb took a similar price increase of $0.08 and $0.10 in July 2022.

71.     In 2022, in furtherance of the conspiracy, McCain Foods figuratively "tore up" its contracts and increased all prices to a 30% margin, regardless of their contracts' remaining durations—an enormous margin a company would not be able to capture if it had to compete on price. The price increase was a "strong arm" approach, enforced because customers had no bargaining leverage and therefore could not contest the price increases. This change was implemented by McCain Foods' upper-level management.

72.     McCain and Lamb Weston could not enforce such substantial price increases without the pricing solidarity of J.R. Simplot and Cavendish Farms. Absent solidarity between all competitors, an individual company's price increase would have been undercut by the other competitors and used to win sales and gain market share by maintaining lower prices. Defendants' price increases continued to conform with each other's, and Defendants have collectively raised

and maintained prices at supra-competitive levels, including through price increases in 2023, to the detriment of Plaintiff and other indirect purchasers of Frozen Potato Products. In 2023, the Director of Sales Solutions for J.R. Simplot acknowledged that Lamb Weston took 35% in price increases and explained that J.R. Simplot, McCain, and Cavendish were also continuing to "push pricing" and "not going after new business."

73.     Indeed, Defendants have experienced margins they could not have enjoyed but for their conspiracy. In 2023, a former VP of International at Lamb Weston acknowledged that Lamb Weston, J.R. Simplot, and McCain "have never ever seen margins this high in the history of the potato industry." He explained that Defendants "absolutely" have "no incentive to fight that hard for each other's share"; instead, they are all "behaving themselves" so as to maintain high margins. He concluded "I think we've done a pretty good job at taking margins with these price increases."

74.     A former Senior Director at McCain Foods' 2024 statement reflected similar price coordination. He noted McCain Foods was unwilling to compete with Lamb Weston on the price of battered fries. He said that he originally thought McCain should compete and pursue more market share for that product, but "the higher ups in the room" said not to risk it.

75.     Similarly, J.R. Simplot's Director of Sales noted that a couple of customers threatened to switch to one of Simplot's competitors after Simplot increased its prices, "but we knew we weren't worried about it." In a competitive market, a producer is worried the effect of raising prices, but here, Defendants were inexplicably confident that they would be undercut 0n price.

76.     Defendants reaped significant rewards from their collusive behavior though their coordinated price hikes and continued to increase prices in the United States while their input costs plummeted.

### C. The Structure and Characteristics of the Frozen Potato Product Industry are Conducive to Conspiracy

#### 1. The Frozen Potato Market is Highly Concentrated

77. A concentrated market facilitates collusion in at least three ways. First, it gives a cartel of sellers more collective bargaining power by reducing buyers' alternatives. Second, communicating and agreeing upon collective action among fewer sellers requires less time and attention. Third, monitoring and policing the agreement among a smaller group of sellers is easier.

78. The market for Frozen Potato Products has become highly concentrated. Two decades ago, there were more than a dozen different companies with meaningful presence in the market; but through consolidation and attrition, has reduced the number of meaningful producers to the four Defendants. This consolidation, as Defendants have admitted publicly, has resulted in rising prices and rising margins.

79. The four Defendants control 97% to 98% of the Frozen Potato Products market: Lamb Weston Holdings controls 40%; McCain Foods Ltd. controls 30%; J.R. Simplot Co. controls 20%; and Cavendish Farms Corp. controls 7% to 8%. The remaining producers account for 2%-3% of the Frozen Potato Products Market.

80. Markets as consolidated as the Frozen Potato Products market present significant concerns for anticompetitive effects on purchasers.

#### 2. The Frozen Potato Market Has High Barriers to Entry

81. High barriers to entering a market facilitate collusion in that market by making it more difficult for new producers to enter. Thus, existing producers, protected by the barriers, have greater latitude to increase prices beyond what a competitive market would bear.

82. One of those barriers is that entering the Frozen Potato Products Market would require extensive capital. For example, Cavendish Farms announced in 2017 that it planned to

17

spend $293 million on a new frozen potato processing plant, and in 2019, it spent $430 million to build a new plant in Alberta, Canada. These costs deter new producers from entering the market.

83. Another barrier is that entering the Frozen Potato Products Market takes significant time, meaning that a new market entrant could not start operating and profiting immediately. For example, J.R. Simplot expected completion of one new plant in Washington to take two years.

84. Another barrier is that Defendants' extensive, long-term relationships with potato growers in the would make it difficult for new market entrants to obtain the raw potatoes necessary to compete. When asked about competitors entering the Washington-Oregon growing area, a former Lamb Weston executive remarked there were "only so many potatoes to go around in the basin area." The executive stated that new competitors had tried to enter the market in the past but did not survive. A stock analyst similarly noted the Idaho-Washington basin region had "minimal unused land and water resources."

### 3. Purchasers of Frozen Potato Products are Fragmented

85. Having numerous buyers for a product supports seller collusion by giving the sellers more collective bargaining power and making it harder for buyers to monitor sellers' conduct. Several segments of buyers for Frozen Potato Products are fragmented in this way.

86. About half of the $1.5 trillion United States food sector operates in the retail segment, where grocery and convenience stores provide food to consume at home. The other half of the food sector operates in the growing food service segment, selling food to consume away from home in restaurants, workplaces, schools, and other locations.

87. As of 2019, the United States had 1,249,737 food operators. Of these operators, retail food service firms like supermarkets and convenience stores accounted for 264,125 units. Restaurants provided 648,462 food operator locations. On-site food service operations, such as

schools, colleges, hospitals, nursing homes, workplace cafeterias, caterers, lodging and recreation, and military sites, accounted for 337,150 sites.

88.     Nine out of ten restaurants have fewer than fifty employees. Seven in ten restaurants are single-unit operations.

89.     Producers like Defendants also sell their production to food service operators through wholesalers and other distributors. Such distributors break down orders from producers, provide warehousing, logistics and transportation, and sell usable quantities of the products to operators. The distributor segment has a competitive market structure and has been described as "highly fragmented." Indeed, one report stated that there are more than 27,000 United States food distribution locations.

### 4.     The Frozen Potato Market is Characterized by Inelastic Demand

90.     "Elasticity" describes the sensitivity of supply and demand to changes in price or quantity.  Demand is "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any. Inelastic demand means that customers have nowhere to turn for alternative, cheaper products of similar quality, so they must continue to purchase the product despite a price increase.

91.     For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would lead to declining sales as customers purchased substitute products or decline to buy altogether. Inelastic demand facilitates collusion by allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

92.     Demand for Frozen Potato Products is highly inelastic. When the price of potatoes increases, the quantity demanded decreases by only a smaller percentage. Frozen French fries, in

particular, are an important offering for food services and restaurants, so processors can raise prices without hurting demand. Lamb Weston CEO Thomas P. Werner said in April 2022 that they "haven't seen" the elasticity for French fries. This comment indicates that at least Lamb Weston's price increases did not reduce its sales. In other words, Frozen Potato Products' demand is highly inelastic. Because the price for Frozen Potato Products is highly inelastic, Defendants were able to and did collectively raise prices to supra-competitive levels without losing revenue.

### 5. Frozen Potatoes are a Commodity

93.     Defendants make similar Frozen Potato Products, and Frozen Potato Products do not differ significantly in quality, appearance, or use. As a result, Frozen Potato Products are functionally interchangeable and considered a commodity product. For example, the Federal Reserve analyzes Frozen Potato Products as a "Producer Price Index by Commodity." In fact, executives from both McCain Foods and Lamb Weston referred to the market or industry as a "mature" market, one characteristic of which is homogeneous product offerings.

94.     When products are interchangeable, the primary way to compete is on the basis of price. The avoidance of price-based competition is the primary motivation for forming a cartel. Thus, cartels are more likely when the participants sell interchangeable products. Where products like Frozen Potato Products are interchangeable, economics suggest that cartel behavior is facilitated because, inter alia, cartel members can more easily monitor and detect defections from a price-fixing agreement.

### 6. Defendants Had Many Opportunities to Collude

95.     Opportunities for collusion facilitate price-fixing by providing cartelists with otherwise legitimate-appearing opportunities to discuss prices and production. Communications among competitors can therefore provide circumstantial evidence of price-fixing. As described

below, the Frozen Potato Products industry features both co-packing arrangements and trade association meetings that provided Defendants with opportunities to collude.

96. In so-called "co-packing" arrangements, a manufacturer outsources part of its production to another company and then sells the products the other company has made. Co-packing agreements give manufacturers an opportunity to discuss prices and their production quantities with each other while discussing their arrangements.

97. Lamb Weston has admitted that it sources part of its production to other companies in co-packing arrangements. It called co-packing "a common industry practice." Later, it stated there "are a limited number of competent, high-quality co-packers in the industry," and having to make alternative arrangements might be unsatisfactory and could affect their ability to "implement our business plan or meet industry demand."

98. Defendants also share membership in multiple trade organizations in this industry. For example, McCain, Lamb Weston, and J.R. Simplot are all members of the Potato Association of America. The "paramount objective" of the Potato Association of America is the "collection and dissemination of the best available technical and practical information relating to all aspects of potato production, biology, and utilization." The Potato Association of America "serves as the official professional society for those involved in potato research, extension, production, and utilization." Every July, the Potato Association of America hosts a multi-day meeting of industry participants, including Defendants.

99. Lamb Weston, McCain, J.R. Simplot, and Cavendish Farms are also all members of the National Potato Council. The National Potato Council "is the voice of U.S. potato growers and industry members" in Washington DC. The National Potato Council advances and protects

potato growers' interests "by addressing issues that affect the potato industry, from policy issues debated in Congress to regulatory issues proposed by federal agencies."

100.    The National Potato Council held its Potato Expo 2021 from January 5-7 2021 as a virtual event. The Council states, "[e]ach year, the Potato Expo brings together growers, suppliers and industry experts to make the largest conference and trade show for the potato industry."

101.    In addition, three of the Defendants have executives on the board of directors of the Potato Sustainability Alliance. As of August 27, 2024, those board members were Richard Burres (Lamb Weston), Spencer Karabelas-Pittman (McCain Foods), and John MacQuarrie (Cavendish Farms).  As of November 4, 2024, Richard Burres (Lamb Weston), Audrey Leduc (McCain Foods), John MacQuarrie (Cavendish Farms), and Jolyn Rasmusen (J.R. Simplot) sit on that board of directors.

102.    Defendants' executives also sit on the board of directors of the American Frozen Food Institute (AFFI). AFFI's 2024 board of directors includes Tina Almond (McCain Foods USA), Michelle Damon (J.R. Simplot Foods), Peter D. Johnston (Cavendish Farms Corporation), and Jennifer Weekes (Lamb Weston).

103.    AFFI's web site describes its "AFFI-CON" event as the "premier frozen ingredients show that brings together over 500 companies and 1,500+ attendees in a single location, allowing them to meet one-on-one to discuss current and future business opportunities. The average attendee will have 40+ private business meetings that will lay the foundation for their year." The next meeting is scheduled for February 22 to 25, 2025, at the Hyatt Regency Dallas, in Dallas Texas.

104.    The industry's common co-packing arrangements and the above industry trade events gave Defendants multiple opportunities to discuss and exchange information about prices and production of Frozen Potato Products.

105.    In addition, all Defendants participate in PotatoTrac, an industry service run through NPD Group, Inc. (now known as Circana ("NPD")), a corporation which "provides market information, tracking, analytic, and advisory services to help clients in making better business decisions." Defendants are Potato Trac's only commercial clients.

106.    Defendants either sell or supply NPD Group, Inc. with their data. PotatoTrac/NPD then sends the Defendants one another's market share information so that each knows where they and their competitors "sit" within the industry. On information and belief, PotatoTrac also includes company projections.

107.    Each of the Defendants willingly share its commercial data and information with PotatoTrac/NPD, knowing that the only other commercial industry participants are its major Frozen Potato Products competitors. Sharing information helps facilitate Defendants' conspiracy.

### D.    The Conspiracy Proximately Caused Plaintiff and Members of the Class to Suffer Antitrust Injury and Damages

108.    Because of the Defendants' anticompetitive conduct: (1) competition in the Frozen Potato Products market has been reduced or eliminated, (2) prices for Frozen Potato Products have been maintained at supracompetitive levels, and (3) United States indirect purchasers of Frozen Potato Products have been deprived of the benefit of price competition.

109.    As a result of the Defendants' anticompetitive conduct, Plaintiff and Class members paid more for Frozen Potato Products than they otherwise would have and thus suffered antitrust injury and damages.

### E.    Fraudulent Concealment and the Tolling of the Statute of Limitations.

110.    Much of the conduct at issue undoubtedly occurred within the various applicable statutes of limitation. No tolling is required for those claims.

111.    Defendant also continued to commit antitrust violations within applicable period of limitation.  They continued to raise prices in lockstep during the Class Period.  In addition, each sale of Frozen Potato Products made to Plaintiff or the putative Classes that was artificially inflated as a result of the conspiracy also constituted a new, overt act that restarted the statute of limitations. For each of these reasons, it is clear that Defendants have committed overt and continuing acts in furtherance of their conspiracy and their antitrust violations within any applicable period of limitations.

112.    In engaging in the price increases and other conspiratorial acts set forth in this Complaint, the Defendants pointed to and utilized false and misleading pretexts, including assertions that the price increases were due to rising costs of potatoes and other inputs for Frozen Potatoes. As set forth herein, and based on Plaintiff's analysis, such pretexts cannot explain or justify the prices increases set forth herein and were intended to conceal Defendants' conspiracy.

113.    As a result of Defendants' and their co-conspirators fraudulent concealment of the conspiracy, the running of any statute of limitations has been tolled with respect to Plaintiff's claims of anticompetitive or unfair business practices alleged in this Complaint.

## V.    CLASS ACTION ALLEGATIONS

114.    Plaintiff brings this action on behalf of itself and, under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of the following Classes, which consist of a Nationwide Class, Nationwide Repealer Subclass, Nationwide Restitution Subclass, and Michigan Subclass (collectively, "Class"), as follows:

a)  Nationwide Class:  All persons and entities in the commercial foodservice sector that purchased Frozen Potato Products indirectly from a Defendant in the United States during the Class Period.

24

b) Nationwide Repealer Subclass: All persons and entities in the commercial foodservice sector that purchased Frozen Potato Products indirectly from a Defendant in Alabama, Alaska, Arizona, Arkansas, California, Connecticut, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin, Wyoming, or the District of Columbia, during the Class Period.

c) Nationwide Restitution Subclass: All persons or entities in the commercial foodservice sector that purchased Frozen Potato Products indirectly from a Defendant in the United States, other than in Indiana or Ohio, during the Class Period.

d) Michigan Subclass: All persons or entities in the commercial foodservice sector that purchased Frozen Potato Products indirectly from a Defendant in Michigan during the Class Period.

115. "Class" as defined herein, includes, and subsumes the Nationwide Class, the Nationwide Repealer Subclass, the Nationwide Restitution Subclass, and the Michigan Subclass.

116. Excluded from the Class are Defendants and each of their respective officers, directors, management, employees, subsidiaries, and affiliates. Also excluded is the Judge presiding over this action, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person.

117. Members of the Class are so numerous and geographically dispersed that joinder is impracticable. Further, members of the Class are readily identifiable from information and records in the possession of Defendants.

118. Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and members of the Class were damaged by the same conspiracy of Defendants.

119. Plaintiff will fairly and adequately protect and represent the interests of members of the Class. The interests of the Plaintiff are coincident with, and not antagonistic to, those of members of the Class.

120. Plaintiff is represented by counsel with substantial experience and success in the prosecution and leadership of antitrust class actions and other complex litigation, including class actions involving agricultural food staple products and other commodities, indirect purchaser cases, and consumer protection litigation.

121. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class, thereby making damages with respect to members of the Class as a whole appropriate.

122. Questions of law and fact common to members of the Class include, but are not limited to:

- Whether Defendants engaged in a combination or conspiracy among themselves to fix, raise, maintain, or stabilize the prices of Frozen Potato Products in the United States;

- Whether Defendants agreed to unreasonably restrain trade in violation of federal antitrust laws;

- The scope and duration of the alleged conspiracy;

- The effect of the alleged conspiracy on the price of Frozen Potato Products during the Class Period;

- The type of injury suffered by Plaintiff and members of the Class;

- Whether the statute of limitations was tolled or whether Defendants fraudulently concealed the existence of their anticompetitive conduct from Plaintiff and the members of the Class;

- The extent to which Defendants were unjustly enriched;

- Aggregate damages suffered by Plaintiff and members of the Class; and

- Whether Defendants acted or refused to act on grounds generally applicable to members of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to members of the Class as a whole.

123. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

124. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in management of this class action.

125. Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

126. Plaintiff has defined members of the Class based on currently available information and hereby reserve the right to amend the definition of members of the Class, including, without limitation, the Class Period.

## VI. CLAIMS FOR RELIEF

**COUNT I:**
**PRICE FIXING**
**Section 1 of the Sherman Antitrust Act**
**15 U.S.C. § 1**

127. Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

128. The Defendants formed an unlawful contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, to raise, fix, maintain, or stabilize Frozen Potato Products prices.

129. Since at least 2021, Defendants agreed with each other to raise, fix, maintain, or stabilize the prices of Frozen Potato Products. The agreement was intended to and did have the purpose and effect of unreasonably restrain trade, suppressing competition, raising, fixing, maintaining, or stabilizing prices in the Frozen Potato Products market in the United States.

130. This conduct is unlawful under the per se standard. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is factually anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

131. Plaintiff and members of the Class have been injured in their business and property by reason of Defendants' violation of Section 1 of the Sherman Act, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. §15.

132. Plaintiff and members of the Class are threatened with future injury to their business and property by reason of Defendants' continuing violation of Section 1 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. §26.

## COUNT II:
## STATE ANTITRUST LAWS

133. Plaintiff repeats and reasserts each of the preceding allegations as if fully set forth herein.

134. During the Class Period, Defendants and their co-conspirators entered and engaged in a contract, combination, or conspiracy to fix, raise, maintain, and stabilize the price of Frozen

Potato prices in various states to unreasonably restrain trade and commerce and harm consumers in violation of the various state antitrust and consumer protection laws set forth below.

135.     In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the alleged combination and conspiracy, including: agreeing to fix, raise, maintain, and stabilize the price of Frozen Potatoes which injured Plaintiff and members of the State Law Class.

136.     Defendants and their co-conspirators engaged in actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize Frozen Potato prices at artificially high levels. As a direct and proximate result of Defendants' conduct, Plaintiff and members of the State Law Class were deprived of free and open competition and paid more to purchase Frozen Potatoes than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is of the type that the antitrust and consumer protection laws of the below states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

137.     In addition, Defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct and come at the expense of and to the detriment of Plaintiff and members of the State Law Class.

138.     Accordingly, Plaintiff and the members of the State Law Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by each particular jurisdiction's law, injunction (where applicable), and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws:

     a.     Alabama, Ala. Code. § 6-5-60, *et seq.*

b. Arizona, Ariz. Rev. Stat. § 44-1401, *et seq*.

c. Arkansas, Ark. Code. Ann. § 4-75-211, *et seq*.

d. California, Cal. Bus. & Prof. Code § 16700, *et seq*.

e. Connecticut, Conn. Gen. Stat. § 35-24, *et seq*.

f. District of Columbia, D.C. Code § 28-4501, *et seq*.

g. Georgia, Ga. Code. § 16-10-22, *et seq*.

h. Hawaii, Hawaii Rev. Stat. § 480-1, *et seq*.

i. Illinois, Illinois Comp. Statutes § 740, Ill. Comp. Stat. 1011, *et seq*.

j. Iowa, Iowa Code § 553.1, *et seq*.

k. Kansas, Kan. Stat. Ann. § 50-101, *et seq*.

l. Maine, Maine Rev. Stat. tit. 10, § 1101, *et seq*.

m. Maryland, Md. Code, Comm. Law § 11-201, *et seq*.

n. Michigan, MCL § 445.773, *et seq*.

o. Minnesota, Minn. Stat. § 325D.49, *et seq*.

p. Mississippi, Miss. Code Ann. § 75-21-1, *et seq*.

q. Nebraska, Neb. Rev. Stat. § 59-801, *et seq*.

r. Nevada, Nev. Rev. Stat. § 598A.010, *et seq*.

s. New Mexico, N.M. Stat. Ann. § 57-1-1, *et seq*.

t. New York, N.Y. Gen. Bus. Law § 340, *et seq*.

u. North Carolina, N.C. Gen. Stat. § 75-1, *et seq*.

v. North Dakota, N.D. Cen. Code § 51-08.1-01, *et seq*.

w. Oregon, Or. Rev. Stat. § 646.705, *et seq*.

x. Rhode Island, R.I. Sat. § 6-36-1, *et seq*.

y.   South Carolina, S.C. Code Ann. § 39-3-10, *et seq*.

z.   South Dakota, S.D. Cod. Laws § 37-1-3.1, *et seq*.

aa.   Tennessee, Tenn. Code Ann. § 47-25-101, *et seq*.

bb.   Utah, Utah Code. Ann. § 76-10-3101, *et seq*.

cc.   Vermont, 9 V.S.A. § 2453a(a)

dd.   West Virginia, W.V. Code § 47-18-1, *et seq*.

ee.   Wisconsin, Wisc. Stat. § 133.01, *et seq*.

ff.   Wyoming, Wyo. Stat. Ann. § 40-4-101, *et seq*.

139.   Defendants' anticompetitive acts described above were knowing and willful and constitute violations of the following state antitrust and consumer protection statutes.

<u>COUNT III:</u>
**STATE CONSUMER PROTECTION LAWS**

140.   Plaintiff repeats and reasserts each of the preceding allegations as if fully set forth herein.

141.   During the Class Period, Defendants engaged in unfair or deceptive acts or practices in violation of the state deceptive trade practices and consumer protection laws pleaded below, and Plaintiff and members of the Class are entitled to relief under:

a.   Alaska, Alaska Stat. § 45.50.531, *et seq*.

b.   Arizona, Ariz. Rev. Stat. §§ 44-1521, *et seq*.

c.   Arkansas, Ark. Code §§ 4-88-101, *et seq*.

d.   California, California Bus & Prof. Code §§ 17200, *et seq*.

e.   Connecticut, Conn. Gen. Stat. § 42-110, *et seq*.

f.   District of Columbia, D.C. Code Ann. §28-3901, *et seq*.

g.   Florida, Fla. Stat. § 501.201, *et seq*.

31

h.   Hawaii, Hawaii Rev. Stat. § 480-2, *et seq.*

i.   Kansas, Kan. Stat. Ann. § 50-623, *et seq.*

j.   Massachusetts, Mass. Gen. Laws, chapter 93A § 1, *et seq.*

k.   Michigan, Mich. Comp. Laws § 445.901, *et seq.*

l.   Minnesota, Minn. Stat. § 325F.69, *et seq.*

m.   Mississippi, Miss. Code § 75-24-1, et seq.

n.   Missouri, Mo. Rev. Stat. § 407.020.

o.   Nebraska, Neb. Rev. Stat. §§ 59-1601, *et seq.*

p.   Nevada, Nev. Rev. Stat. §§ 598.0903, *et seq.*

q.   New Hampshire, N.H. Rev. Stat. §§ 358-A:1, *et seq.*

r.   New Jersey, N.J. Stat. § 56-8-1, *et seq.*

s.   New Mexico, N.M. Stat. Ann. §§ 57-12-1, *et seq.*

t.   New York, N.Y. Gen. Bus. Law § 349, *et seq.*

u.   North Carolina, N.C. Gen. Stat. §§ 75-1.1, *et seq.*

v.   Rhode Island, R.I. Gen. Laws §§ 6-13.1-1, *et seq.*

w.   South Carolina, S.C. Code Ann., §§ 39-5-10, *et seq.*

x.   Vermont, 9 V.S.A. § 2453a

142.   The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of these statutes and, accordingly, Plaintiffs and the members of the Class seek all relief available under thereunder.

**COUNT IV:**
**UNJUST ENRICHMENT**

143.   Plaintiff repeats and reasserts each of the preceding allegations as if fully set forth herein.

144.    Defendants financially benefited from their unlawful acts at the expense of Plaintiff and members of the Class, who paid supracompetitive prices for Frozen Potato Products during the Class Period.

145.    It is unjust and inequitable for Defendants to have enriched themselves in this manner at the expense of Plaintiff and members of the Class, and the circumstances are such that equity and good conscience require Defendants to make restitution to Plaintiff and members of the Class.

146.    Defendants should be made to disgorge their ill-gotten gains to a constructive trust created for the benefit of Plaintiff and members of the Class, from which Plaintiff and members of the Class may obtain restitution.

147.    By reason of the foregoing, Plaintiff and members of the Class are entitled to relief under the laws of all states and the District of Columbia, other than Indiana and Ohio.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and members of the Class, respectfully prays that This Honorable Court:

A.    Order that this action may be maintained as a class action pursuant to Rules 23(a) & (b) of the Federal Rules of Civil Procedure, that he be named a Class Representative, that the undersigned be named Lead Class Counsel, and that reasonable notice of this action, as provided by Rule 23(c)(2), be given to members of the Class;

B.    Adjudge that Defendants violated federal antitrust laws, as set forth above;

C.    Adjudge that Defendants violated State antitrust and trade regulation laws, as set forth above;

D.     Award Plaintiff and members of the Class actual, treble, punitive, and exemplary damages; attorneys' fees and costs of suit, including costs of consulting and testifying experts; and pre- and post-judgment interest;

E.     Order disgorgement and restitution;

F.     Enjoin Defendants from their continuing violations of federal and state law;

G.     Grant prospective injunctive relief, including structural relief, to prevent and restrain any future violations of law;

H.     Grant such other, further, and different relief as may be just and proper.

## VIII.   DEMAND FOR JURY TRIAL

Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a Trial by Jury as to all issues so triable.

Dated:  December 22, 2024.                    Respectfully submitted,


 */s/ Garrett D. Blanchfield*
Garrett D. Blanchfield (*pro hac vice forthcoming*)
Brant D. Penney (*pro hac vice forthcoming*
Roberta A. Yard (*pro hac vice forthcoming*)
REINHARDT WENDORF & BLANCHFIELD
80 South 8th Street, Suite 900
Minneapolis, MN  55402
Tel:  (651) 287-2100
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com
r.yard@rwblawfirm.com

*/s/ Charles R. Watkins*
Charles R. Watkins
GUIN, STOKES & EVANS, LLC
805 Lake Street, #226
Oak Park, IL 60301
(312) 878-8391
charlesw@gseattorneys.com